**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ANTHONY MELDON,** | ) | **CASE NO. 1:16 CV 2085** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| **VILLAGE OF CHAGRIN FALLS, et al.,** | ) | |
| | ) | |
| Defendants. | ) | **MEMORANDUM OPINION** |
| | ) | |

This matter is before the Court on the Motion for Summary Judgment filed by Defendants, Village of Chagrin Falls, Thomas Brick, David B. Bloom, Ben Himes and Harry Edwards ("the Village Defendants") (Docket #33) and the Motion for Summary Judgment filed by Defendant, Picone Company, Inc. ("Picone") (Docket #34).

**I.  Factual Background.**[1]

In January 2014, structures owned by Mr. Meldon located at 291 N. Main Street, Chagrin Falls, Ohio, ("the Property") were demolished by Picone at the request of the Village of Chagrin Falls ("the Village").  The structures – which consisted of a house (approximately 1,750 square feet) with attached garage and a separate cottage (approximately 850 square feet) – were

---

[1] The facts stated herein are taken from the Parties' submissions.  Those material facts that are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to the non-moving party.

purchased by Mr. Meldon in March 1979. After living in the house for a couple of years, Mr. Meldon and his family moved and he began renting the house and cottage as two separate residences.

### A. Sewer Problems and Arrest.

In late 2008, the tenant in Mr. Meldon's cottage complained to Village officials about a sewer backup. The Village and Mr. Meldon each laid blame on the other for the problem causing the backup. The Village installed a check valve on Mr. Meldon's property to remedy the issue and, on January 5, 2009, Ben Himes, Village Chief Administrative Officer, sent the following letter to Mr. Meldon:

> Dear Mr. Meldon:
>
> The Utilities Department has investigated your sewer lateral and pump system. Your line was televised and found to be clear and in good condition. Under normal conditions there is no back pressure other than that caused by gravity and the friction loss in the pipe which should not be effecting the life of your pump. A check valve was installed on your line to prevent sewage from backing up into your lateral when the sanitary sewer main surcharges. The Village will be investigating the installation of a standby generator to prevent sewage from overflowing the lift station holding thank during power outages.
>
> The Utilities Department did find what it believes is the cause of your pump problems. The pump used in the holding tank is a sump pump designed for clear water and not a grinder pump which is capable of handling solids in sanitary wastes. Installing a grinder pump suitable for sanitary sewage should remedy your pump longevity problems. As always, do not hesitate to call if you have any questions.

(Docket #36 at p. 141.)

The Village alleges that there was evidence that Mr. Meldon had intentionally cut the sewer line. In 2009, based on information that was presented to him by Village Building and Zoning Inspector Harry Edwards, Village Prosecutor Thomas Hanculak issued a warrant for Mr. Meldon's arrest for sewer-related violations of the Village Building Code. Mr. Meldon was

ultimately arrested after voluntarily coming to the police station. (Docket #40-1 at p.1-4.)

In 2011, the Village installed a standby generator on the Mr. Meldon's Property to further ensure the system would function properly. Mr. Meldon objected to the installation, stating as follows in a letter dated May 16, 2011:

> Mr. Himes,
>
> Please consider this letter notification I am objecting in the strongest terms possible to your locating your back-up generator next to my driveway in front of my house at 291 N. Main Street, Chagrin Falls, Ohio 44022.
>
> Please cease and desist in all construction until I have been notified and included in discussions about this generator. It belongs under ground where it used to be originally or at worst, in the corner of the lot out of sight, not right next to my driveway in front of the house ruining my property values.
>
> You are ruining my property value, and I have been informed by my tenant he is also leaving. Your Village trucks have also driven on my property causing damage and leaving deep ruts in the wet soil. I was also attempting to sell this house and you have further damaged me by locating this monstrosity directly in front of my house practically touching my entrance driveway.
>
> Please contact me as soon as possible.

(Docket # 36 at p. 142.)

### B. Fire in the Garage.

On January 7, 2014, a fire occurred on the Property in the garage attached to the house, causing significant damage to the roof of the garage and damage to the breezeway connecting the garage to the house. There was also some damage to the interior walls of the house caused by firefighters as they worked to ensure the fire was extinguished. As a result of the fire, the family renting the house was forced to vacate, leaving behind their belongings. The cottage, which was not being rented at the time, was not involved in the fire and suffered no damage. The utilities to both the home and cottage were disconnected following the fire.

On January 24, 2014, Mr. Meldon obtained a minor permit for repairs relating to weather proofing the main house, but failed to make any repairs or safeguard the house at that time. (Docket #36 at p. 147.) Over the next several months, Mr. Meldon states that he had the damage inspected and hoped to have repairs made to the garage roof and breezeway, seeking repair estimates. (Docket #36 at pp. 148-49.) The house remained vacant and the belongings of the prior tenant had been moved and remained outside into the yard.

On May 2, 2014, Mr. Edwards, received a letter from several Village residents regarding the condition of the property. (Docket #36 at p. 150.) Mr. Edwards states he had also received phone calls regarding the same. On May 9, 2014, a notice was posted on the house. The notice was printed with the words "Stop Work," which were crossed out and handwritten above were the words "Property Condemned." The notice incorrectly cited Chagrin Falls Ordinance 1308.08, presumably an inadvertent error as the actual Ordinance referenced should have been 1303.08. (Docket #36 at p. 157.) No notice was posted on the cottage.

Mr. Edward testified he also sent letter via certified mail to Mr. Meldon on May 8, 2014 regarding the same. (Docket #36 at p. 158.) The letter reads as follows:

Mr. Meldon:

Pursuant to the laws of Ohio and the Village of Chagrin Falls, your property located at 291 North Main Street, Chagrin Falls, Ohio is declared to be insecure, unsafe, and structurally defective. Further, the house and property are unsanitary, constitute a fire hazard, are dangerous to human life, and are otherwise not fit and habitable. This is due to inadequate maintenance (as required by the Codified Ordinances of the Village), dilapidation, obsolescence, and/or abandonment.

Accordingly, the house and property are hereby condemned. As such, no individuals are allowed to inhabit the house at this location and only licensed contractors or you may enter the house for the sole purpose of initiating demolition. BE ADVISED THIS DEMOLITION MUST BE UNDERTAKEN AND COMPLETED WITHIN THIRTY (30) DAYS OF THE RECEIPT OF

THIS NOTICE.

Also, you must abate the storage of the damaged building materials on the property which were removed from the house subsequent to the fire that took place. THESE MATERIALS MUST BE REMOVED WITHIN TEN DAYS OF THE RECEIPT OF THIS LETTER.

If you fail to timely demolition the house and fail to timely remove the building rubbish and materials stored outside, the Village of Chagrin Falls will do so and the costs incurred will be you direct responsibility.

Please also be advised that the failure to undertake the required remedial actions set forth in this Notice may also serve as the basis for citations being issued against you with each day of ignoring these mandates being separate, cumulative offense.

If you have any questions whatsoever please contact me immediately. We will also give you direction as to the necessary permits for demolition.

(Docket #36 at p. 158.)

On May 15, 2014, Mr. Meldon sent a letter to Mr. Himes and Mr. Edwards. The letter reads as follows:

Presently we are in court and my attorney Edgar Boles is handling the 291 N. Main St. Chagrin Falls 44022 eviction of my litigious tenant who is threatening to sue anyone and everyone. She is no longer allowed in the house as a result of its having been condemned. Her belongings are still in the house. The construction crew handling clean-up, tear down, and reconstruction is behind on jobs and has been hampered because of the worst winter on record in NE Ohio, and no inclement rain practically everyday including today. I can't even get my tractor in there to cut grass as it is sticking in wet soggy mud. With the house, which was not damaged in the garage fire, "condemned" I am forced to shift from Construction mode to Demolition estimates. I respectfully request you rescind the condemnation of the house.
We have begun cleanup outside the front of the house putting the tenant's burned belongings out of sight in the garage despite threats from her she will sue if I touch her belonging [sic] inside or out of the house. Reconstructing the garage roof and breezeway drywall or demolishing the house I believe could be completed by July 31st 2014-August 15th 2014 - if we have to demolish the house. Demolition people I have spoken with today also need dry weather to operate heaving equipment around the house and not destroy or ruin the woods and property so we may effectively sell the land.
My Property will be restored or destroyed in one way or the other, probably faster

-5-

than restaurant Jekell's fire which happened Oct 6, 2013 in Chagrin Falls, and only now is beginning restoration work 7 months later.
Enclosure: pics proposed new garage roof, breezeway work.
Mr. Himes/Edwards please contact me, as soon as possible, so I know if this answers your question, and I may proceed without a 'condemnation' on my house.

(Docket #36 at p. 158.)

In early June 2014, Mr. Meldon and his attorney, Pearce Leary, met with Mr. Edwards, along with Village Chief Administrative Officer Ben Himes and Prosecutor Hanculak. On June 10, 2014, Prosecutory Hanculak issued a letter to Mr. Leary, staying the condemnation and citation with certain conditions, stating as follows:

> Good seeing you the other day. To confirm the Village's stance on this matter, the condemnation process and the citation process will be stayed shortly based on the following conditions:
>
> 1. The grass be cut and maintained per code.
>
> 2. The land and the house and the garage be secured so that trespassers, juveniles, animals, rodents cannot enter or be injured. This must be done immediately.
>
> 3. The garage roof must be removed and replaced immediately.
>
> 4. It is the intent of your client that rather than demolish the house and garage, that it be rehabilitated per code. This work will begin no than July 8, 2014 and completed in a reasonable period thereafter. I've been asked by the Village to remind you and your client that contractors must be registered with the Village and any structural work or changes to the existing structure requires plans stamped either by a structural engineer or State of Ohio architect. Also, necessary permits must be obtained for electrical, plumbing, mechanical, general contracting.
>
> Let me suggest that before any work begins or permits are pulled that Harry Edwards be contacted to perform an interior and exterior inspection along with Fire Marshall James Alunni. Also, this will confirm that I am willing to obtain a search warrant if the current tenants refuse entry and/or the eviction bogs down in Court.
>
> Please remind your client that there will be no extensions on time or

>amendments to these conditions. If any of the conditions are not performed, citation and/or civil and/or condemnation will commence.

(Docket #36 at p. 161.)

On June 15, 2014, Mr. Meldon obtained a demolition estimate from Green Vision Materials, which included a quote of $9,000.00 for the main house and garage, and a separate quote of $4500.00 for the cottage. The estimate noted a $500 discount if demolition of the house, garage and cottage were done at the same time. (Docket #35 at p. 166.)

During deposition, Mr. Meldon testified that he spoke with Councilman Rick Subble, explaining to him that he "didn't understand" and "didn't agree with" what the Village was doing. Mr. Meldon testified Mr. Subble told him to appear before the Board of Zoning Appeals and talk to Wade Frick, a member of the BZA. Mr. Meldon testified, "I went to get the paperwork and essentially Ben Himes and Harry, and Hunculak, Tom Hanculak stopped me. They were going to great lengths to make sure that I didn't get it filed. They told me I couldn't file it." (Meldon Depo. at p. 96.) Mr. Meldon stated, "They told me I couldn't file it, that it was too late." (Id.) Further, Mr. Meldon stated, "And then, the attorneys talked, you know. That was the end of it. They were really pushing condemnation." (Id.)

The Village states that on or about June 23, 2014, Mr. Meldon "had improper contact with a Chagrin Falls Board of Zoning Appeals member regarding a variance to have no garage for the main house." (Docket #33 at p. 6, Affidavit of Prosecutor Hanculak at Paragraph 5.) Prosecutor Hanculak states in his Affidavit that because of Mr. Meldon's "improper contact" with a BZA member, and the fact that Mr. Meldon had not begun work on the Property, he considered Mr. Meldon to be in violation of the stay of condemnation proceedings. (Docket #33-8, Affidavit of Prosecutor Hanculak at Paragraphs 5-9.) On June 24, 2014, Prosecutor

Hanculak sent an email to Mr. Leary, informing him that the stay had been lifted and demolition would proceed on July 15, 2014 unless the nuisances were abated and notifying him that the Property would be inspected in anticipation of demolition by the Village. (Docket #33-8 at p. 3.)

On June 26, 2014, Mr. Edwards, along with Electrical Inspector Dave Hocevar and Fire Inspector Jim Alunni, inspected the interior and exterior of the house and garage. Mr. Meldon did not object to the inspection. Reports were then given to Mr. Leary, detailing multiple violations and nuisances in the house, in addition to the fire damage, including "foundational problems, electrical issues, ceiling damage resulting from the fire, and basement water intrusion," which the Village asserts rendered the living area "unfit and unsafe for habitation." The exterior was noted as being abandoned an falling down. The cottage was never inspected.

On or around June 27, 2014, Mr. Meldon received an estimate of $23,250 from Lightning Demolition and Excavating on June 27, 2014, which included demolition of the house, garage and cottage. (Docket #36 pp. 162-64.) Mr. Meldon took no action. On July 3, 2014, the Village obtained a demolition estimate from Picone for demolition of the main house, garage and cottage, which was forwarded to Mr. Leary. On July 7, 2014, Mr. Meldon sent a letter to Mr. Himes and Mr. Edwards stating that he had contracted with Green Vision for demolition work and that Green Vision would be pulling permits for the work. (Docket #36 at p. 167.)

Two or three weeks thereafter, the house, garage and cottage were demolished by Picone at the request of the Village. While the Village asserts that the house and garage were demolished due being uninhabitable, the cottage was also demolished even though it had never been inspected. Mr. Himes asserts that the cottage was demolished because a home without a garage would fail to conform with Village zoning laws. The Parties dispute the actual demolition date – a fact relevant to whether certain claims were filed within the applicable

-8-

statute of limitations. The Village argues the demolition date was July 15-16, while a Village Ordinance – adopted after the demolition – lists July 21, 2014 as the date of demolition. The costs of demolition were certified to the County Auditor for placement on the tax duplicate pursuant to Ohio Rev. Code § 715.261. In May 2016, Mr. Meldon sold the Property for approximately $160,000 and the demolition lien was paid.

**II.     Procedual Background.**

Mr. Meldon initially filed his Complaint in the Cuyahoga County Court of Pleas, Case No. CV 16 866473, on July 20, 2016. All Defendants filed a Notice of Removal with this Court on August 19, 2016. Mr. Meldon alleges that the Village has "continuously harassed [him] and his use of the Property, including without limitation having him wrongfully arrested for no cause, demolishing his Property and placing meters/equipment on his property." (Complaint at Paragraph 5.)

Mr. Meldon asserts claims for Wrongful Condemnation, alleging Defendants' decision to condemn the Property was arbitrary, capricious, and done maliciously and in bad faith (Count I); Trespass, alleging Defendants entered upon the Property without Mr. Meldon's consent or permission, demolishing improved structures on the Property and installing meters/equipment in the center of the Property injuring it (Count II); Wrongful Demolition, alleging that the "Notice of Condemnation/Notice to Abate Nuisance was improper in a number of ways" and that "Defendants acted with a malicious purpose, in bad faith and in a wanton and reckless manner in demolishing the improved structures on the Property" (Count III); Unjust Enrichment, alleging he "clearly communicated that he had a less expensive proposal to demolish the improved structures on the Property" and that "Defendants acted with a malicious purpose, in bad faith, and in a wanton and reckless manner in selecting and using Defendant Picone as the contractor

-9-

to demolish the improved structures on the Property, given the availability of a less expensive comparable alternative (Count IV); Wrongful Taking under Federal and State Law, alleging that "by condemning and demolishing Mr. Meldon's Property and placing meters/equipment upon it, Defendant Village has deprived Mr. Meldon of his property without just compensation and in violation of his rights under the Ohio Constitution and the United States Constitution (Count V); and, Negligence (Count VII).[2]

Defendants filed Motions for Summary Judgment on May 8, 2017. (Docket #s 33 and 34.) Mr. Meldon filed Opposition Briefs on June 7, 2017 (Docket #s 40 and 41) and an addition Opposition Brief on June 23 (Docket #43). Defendants filed Reply Briefs on June 28, 2017 and June 29, 2017. (Docket #s 46 and 47.) Mr. Meldon filed Surreply Brief on July 7, 2017. (Docket #49.)

### III. Standard of Review.

Summary judgment is appropriate when the court is satisfied "that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden of showing the absence of any such "genuine dispute" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine [dispute] of material fact.

---

[2] Mr. Meldon had originally included a claim for Count VI, a claim for False Arrest/False Imprisonment, related to an arrest in 2009 stemming from plumbing code violations, was voluntarily dismissed, with prejudice, by Mr. Meldon, as noted in this Court's May 2, 2017 Order. (Docket #30.) Mr. Meldon asserts that the events leading up to his arrest are proof of the Village's ill-will.

-10-

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a dispute is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual [disputes] that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

**IV. Discussion.**

Picone is entitled to summary judgment as to all of Mr. Meldon's claims against it. Picone was given authorization by the Village to enter and demolish the structures on the Property. Picone "had no duty to confirm by independent investigation the apparently reliable representations from responsible [Village] officials." *Shimola v. H.B. Lockhart Constr. Co.*, 1986 Ohio App. LEXIS 7034, 1986 WL 6365, *5 (Ohio Ct. App., Cuyahoga County June 5, 1986).

-11-

The Village contracted with Picone to demolish the structures and Village Police, City Officals, and Mr. Meldon were all present at the time the structures were demolished and gave no indication that the demolition may not be lawful. There is nothing to suggest Picone acted negligently or recklessly and, based on the facts and circumstances of this case, no other legal basis under which Picone is liable for the demolition. Accordingly, Picone's Motion for Summary Judgment is granted.

Count V of Mr. Meldon's Complaint alleges Wrongful Taking, specifically that "[b]y condemning and demolishing Mr. Meldon's Property and placing meters/equipment upon it, Defendant Village has deprived Mr. Meldon of his Property without just compensation in violation of his rights under the Ohio Constitution and the United States Constitution." An action for unlawful taking is not ripe for adjudication where a plaintiff has not pursued available State remedies. *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 195 (1985). "'[I]f a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and has been denied just compensation.' In other words, a wronged party satisfies its duty to seek just compensation by pursuing 'reasonable, certain, and adequate procedures' for obtaining compensation." *Coles v. Granville*, 448 F.3d 853, 861 (6th Cir. Ohio May 22, 2006)(quoting in part *Williamson*, 473 U.S. at 195). "[P]rior to exercising jurisdiction over a takings case, a federal court must first inquire into whether or not the relevant state compensation procedures are 'reasonable, certain, and adequate.'" *River City Capital v. Bd. of County Comm'rs*, 491 F.3d 301, 306-07 (6th Cir. Ohio 2007) (citations omitted).

In Ohio, "Mandamus is the appropriate action to compel public authorities to institute appropriation proceedings where an involuntary taking of private property is alleged." *State ex*

*rel. Coles v. Granville,* 116 Ohio St.3d 231, 237 (Ohio Nov. 20, 2007)(quoting *State ex rel. Shemo v. Mayfield Hts.*, 95 Ohio St.3d 59, 64, 2002 Ohio 1627, 765 N.E.2d 345 (2002)); *River City*, 491 F.3d 301, 301). Ohio's mandamus action constitutes a "'reasonable, certain, and adequate' procedure[s] for plaintiffs to pursue for an involuntary taking." *Coles*, 448 F.3d 853, 865. "[T]hus … the primary inquiry, at least for asserting ripeness, is whether or not an Ohio takings plaintiff has fully exhausted his state mandamus remedies before coming to federal court. If he has, then the case is ripe for [federal judicial] review. If he has not, then it is not." *River City*, 491 F.3d 301, 307.

Under the facts and circumstances in this case, genuine issues of material fact persist which would preclude summary judgment and necessitate trial. However, Mr. Meldon has not pursued State mandamus relief. Accordingly, Mr. Meldon's Wrongful Taking claim (Count V) is not ripe for review and is hereby dismissed without prejudice, subject to refiling if warranted. Furthermore, in an effort to preserve the resources of all Parties and the Court, Mr Meldon's state common law claims for trespass, wrongful condemnation, wrongful demolition, unjust enrichment, and negligence (Counts I-IV and VI) – all of which seek damages resulting from what Mr. Meldon alleges were unlawful takings for which he did not receive just compensation – are hereby dismissed without prejudice, with the right to refile following the completion of State mandamus proceedings, if necessary.

**V. Conclusion.**

The Motion for Summary Judgment filed by Defendant, Picone Company, Inc. (Docket #34) is hereby GRANTED.

The Motion for Summary Judgment filed by the Village Defendants (Docket #33) is hereby GRANTED IN PART AND DENIED IN PART.

-13-

The Village's Motion is granted only with regard to the requirement that Mr. Meldon first file a State mandamus action prior to filing his wrongful taking claim with this Court. The Motion for Summary Judgment is hereby denied on all other grounds.

Mr. Meldon's takings claim is not ripe for review and is hereby DISMISSED WITHOUT PREJUDICE, as to all remaining Defendants, with the right to refile following the completion of State mandamus proceedings, if necessary. Likewise, all remaining claims against all remaining Defendants are hereby DISMISSED WITHOUT PREJUDICE, with the right to refile following the completion of State mandamus proceedings, if necessary.

All pending motions are hereby terminated.

This case is hereby TERMINATED.

                                         Donald C. Nugent
                                        DONALD C. NUGENT
                                        United States District Judge

DATED: September 8, 2017